UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON TEXAS

United States Courts
Southern District of Texas
FILED

MAY 2 5 2011

David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| v. | § |
| | § |
| | § |
| BERNARD LANGLEY (4) and | § |
| CLYDE MELTZER (6) | § |

CRIM. NO. H-10-787-SS

## SECOND SUPERSEDING INDICTMENT

### COUNT ONE
(Conspiracy to Commit Wire Fraud–18 U.S.C. § 1349)

A. INTRODUCTION

At all times material to this indictment:

1.      Houston Refining LP (Houston Refining) operated one of the largest refineries in the Houston area.  Houston Refining was owned by Lyondell Chemical Co. (Lyondell), which became part of LyondellBasell Industries in December 2007. Lyondell maintained the headquarters of its United States operations in Houston and employed thousands in the Houston area.

2.      Houston Refining purchased the majority of the crude oil used at its refinery from Venezuela.  The cost of shipping this crude oil from Venezuela to Houston was a significant expense.

3.    The price for shipping crude oil was determined by multiplying the following three factors: a) the amount of crude oil, which is typically 70,000 metric tons; b) the World Scale Base Rate, which is set annually, remains constant throughout the year, and is based on factors such as size of the vessel, starting location, and delivery point; and c) the market rate, which is the only factor that fluctuates throughout the year. While the market rate fluctuates, industry groups such as the Association of Ship Brokers and Agents (ASBA) publish market prices on a weekly basis. Major oil importers like Houston Refining typically entered into arrangements that based a significant portion of the shipping cost for crude oil on the published market rate prevailing on the bill of lading date.

4.    Jonathan Barnes, a co-conspirator not charged in this second superseding indictment, was the Marine Chartering Manager for Houston Refining from late 2006 through early 2010. The Marine Chartering Manager negotiates the terms for the shipment of oil from Venezuela to the Houston refinery.

5.    BERNARD LANGLEY and CLYDE MELTZER were business associates who had worked together at multiple companies in the international oil trading industry, many of which maintained offices in Zug, Switzerland. They also controlled the following companies:

a.      Fossil Energy Resources, Ltd. (Fossil Energy), incorporated in the British Virgin Islands, which maintained a bank account at UBS in Switzerland.

b.      Dulson Investment, Ltd. (Dulson Investment), incorporated in the British Virgin Islands, which maintained a bank account at UBS in Switzerland.

c.      Camac International, Ltd. (Camac Belize), which purported to be incorporated in Belize and maintained a bank account at UBS in Switzerland. Camac Belize used, without authorization, the name of a company doing business in Houston with which MELTZER and LANGLEY were associated during 2006 and 2007 (Company A).

B.     THE CONSPIRACY AND ITS OBJECT

6.      From in or about October 2006 and continuing until in or about March 2010, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

**BERNARD LANGLEY** and

**CLYDE MELTZER,**

did knowingly combine, conspire, confederate and agree with each other, with Jonathan Paul Barnes, and with others known and unknown to the Grand Jury to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be

3

transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343.

C.    MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that:

7. MELTZER and LANGLEY would and did conduct business with Houston Refining under the false pretense that Company A, Camac Belize and Fossil arranged shipping at market rates negotiated in arms-length transactions, when in fact MELTZER and LANGLEY paid millions in kickbacks to Barnes so that Barnes's incentive was to agree to higher shipping rates rather than to obtain the lowest possible rates for his employer Houston Refining.

8. As a result of the millions of dollars in kickbacks he received from MELTZER and LANGLEY, Barnes would and did agree with the defendants to shipping rates that resulted in Houston Refining paying Company A, Camac Belize, and Fossil Energy prices more than $50 million above published ASBA market rates prevailing when the shipments occurred.

9. MELTZER and LANGLEY would and did use a ship broker to hire tankers for the actual shipping of crude to Houston Refining at rates much closer to the lower, published market prices. The defendants would and did then use this substantial

4

spread between the prices they charged Houston Refining and the prices they actually paid for shipping to pay the millions of dollars in kickbacks to Barnes and to unjustly enrich themselves with tens of millions of dollars. Prior to and after Barnes's tenure as Marine Chartering Manager, Houston Refining contracted directly through the ship brokers without the unnecessary step in the process that the defendants' use of Company A, Camac Belize and Fossil Energy created.

10.    The defendants would and did receive the inflated payments from Houston Refining through foreign and interstate bank wire transfers and would provide the kickbacks to Barnes using foreign and interstate bank wire transfers.

11.    During 2007 when LANGLEY and MELTZER were employed at Company A, they would and did authorize and submit fraudulent invoices to Company A's accounting department that listed substantial expenses to be paid purportedly to fictitious shipping broker companies when LANGLEY and MELTZER knew that the invoices were a means of paying kickbacks to Barnes and receiving some of the proceeds themselves.

12.    During 2007, in another attempt to obtain the proceeds for themselves rather than having Company A receive proceeds, LANGLEY and MELTZER would and did use a bank account LANGLEY created at UBS in Switzerland in the name of Camac Belize to receive wire transfers from Houston Refining.

13.     Beginning in 2007 and continuing through 2009, LANGLEY and MELTZER would and did bill Houston Refining using the name Fossil Energy and would receive funds at a UBS bank account in Switzerland in the name of Fossil Energy that they controlled.

14.     The defendants would and did take steps to conceal the kickbacks. These steps to conceal included LANGLEY and MELTZER transferring the proceeds received from Houston Refining at the Fossil Energy account at UBS in Switzerland into a conduit account at UBS in Switzerland in th name of Dulson Investments, from which they then wired payments to Barnes's U.S. bank accounts so Barnes's bank statements would not show incoming wires from Fossil Energy with which he was supposed to be conducting arms-length business.

15.     In mid-2009, Barnes would and did enter into a similar kickback arrangement with other persons known to the Grand Jury who agreed to pay him a higher percentage of the profits as kickbacks, though Barnes, LANGLEY and MELTZER continued to arrange shipping through Fossil Energy on a less frequent basis.

16.     After new management at Houston Refining began scrutinizing the shipping charges in late 2009, the defendants and Barnes would and did quickly enter into new contracts which provided for shipping rates close to the published market rates.

D.    OVERT ACTS

17.    In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Southern District of Texas and elsewhere:

a.    On or about October 17, 2006, MELTZER had lunch with Barnes at a restaurant in Houston.

b.    On or about October 18, 2006, LANGLEY opened a bank account for Camac Belize at UBS in Switzerland.

c.    On or about December 10, 2006, MELTZER and Barnes met with shipping brokers in Florida.

d.    On or about January 30, 2007, Barnes, LANGLEY and MELTZER caused Houston Refining to wire $1,197,739, which was calculated using a multiplier of 2.25 when the published ASBA market rate was 1.56, to an account Company A had at BNP Paribas in France.

e.    On or about February 21, 2007, LANGLEY and MELTZER signed and submitted to Company A's accounting department an "IFO Energy Services" invoice in the amount of $278,358.33 which listed a UBS Switzerland account controlled by Barnes as the recipient of the wire transfer.

f.    On or about May 3, 2007, Barnes, LANGLEY and MELTZER caused Houston Refining to wire $1,128,152, which was calculated using a multiplier of 1.95

7

when the published ASBA market rate was 1.38, to a Fossil Energy account at UBS in Switzerland.

g.      On or about May 3, 2007, Barnes, LANGLEY and MELTZER caused a $773,213 wire transfer to be sent from the Fossil Energy account at UBS in Switzerland to American Title to fund BARNES's purchase of a home in Bellaire, Texas.

h.      On or about May 21, 2007, Barnes, LANGLEY and MELTZER caused a $105,831.04 wire transfer to be sent from the Fossil Energy account at UBS in Switzerland to a Mercedes dealership in Houston to fund BARNES's purchase of a car.

i.      On or about June 18, 2007, LANGLEY signed and submitted to Company A's accounting department a "Farid Business Inc." invoice in the amount of $497,316.50 which purported to be an "Invoice for Broker Service" but which directed a wire transfer to a UBS account in Switzerland controlled by Barnes.

j.      On or about September 12, 2007, Barnes, LANGLEY and MELTZER caused Houston Refining to wire $1,154,056, which was calculated using a multiplier of 2.1 when the published ASBA market rate was 0.99, to an account Company A maintained at BNP Paribas in France.

k.      On or about September 21, 2007, Barnes, LANGLEY and MELTZER caused a $168,789.81 wire transfer to be sent from the Dulson Investment account at

UBS in Switzerland to a Mercedes dealership in Houston to fund BARNES's purchase of a car.

l.     On or about October 2, 2007, Barnes, LANGLEY and MELTZER caused Houston Refining to wire $991,257.27, which was calculated using a multiplier of 2.1 when the published market rate was 1.09, to the Camac Belize account at UBS in Switzerland.

m.     On or about December 18, 2007, Barnes, LANGLEY and MELTZER caused Houston Refining to wire $1,014,288.89, which was calculated using a multiplier of 2.15 when the published ASBA market rate was 1.25, to a Fossil Energy account at UBS in Switzerland.

n.     On or about July 22, 2008, Barnes, LANGLEY and MELTZER caused Houston Refining to wire $1,887,294, which was calculated using a multiplier of 3.75 when the published ASBA market rate was 1.86, to a Fossil Energy account at UBS in Switzerland.

o.     On or about October 15, 2008, Barnes, LANGLEY and MELTZER caused a $99,985 wire transfer to be sent from the Dulson Investment account at UBS in Switzerland to BARNES's Wachovia account.

p.     On or about October 31, 2008, Barnes, LANGLEY and MELTZER caused a $100,584 wire transfer to be sent from the Dulson Investment account at

UBS in Switzerland to DeBeers in the United States to fund BARNES's purchase of jewelry.

     q.    On or about November 10, 2008, Barnes, LANGLEY and MELTZER caused Houston Refining to wire $2,372,039, which was calculated using a multiplier of 2.45 when the published ASBA market rate was 1.28, to a Fossil Energy account at UBS in Switzerland.

     r.    Between on or about December 12 and 22, 2008, LANGLEY and MELTZER caused the following two wires to be sent from UBS to a Mercedes dealership in Houston for Barnes's purchase of a Mercedes McLaren: a $319,980 wire transfer from the Fossil Energy account and a $199,001 wire transfer from the Dulson Investment account.

     s.    On or about January 30, 2009, Barnes, LANGLEY and MELTZER caused Houston Refining to wire $1,603,003, which was calculated using a multiplier of 2.5 when the published ASBA market rate was 1.245, to a Fossil Energy account at UBS in Switzerland.

     t.    On or about June 11, 2009, Barnes, LANGLEY and MELTZER caused a $1,000,000 wire transfer to be sent from the Dulson Investment account at UBS in Switzerland to BARNES's Wachovia account.

u.     On or about June 24, 2009, Barnes, LANGLEY and MELTZER caused a $2,800,000 wire transfer to be sent from the Dulson Investment account at UBS in Switzerland to BARNES's Wachovia account.

v.     On or about July 2, 2009, Barnes, LANGLEY and MELTZER caused a $2,000,000 wire transfer to be sent from the Dulson Investment account at UBS in Switzerland to BARNES's Wachovia account.

w.     On or about October 14, 2009, Barnes, LANGLEY and MELTZER caused Houston Refining to wire $1,333,071, which was calculated using a multiplier of 1.75 when the published ASBA market rate was .78, to a Fossil Energy account at UBS in Switzerland.

x.     On or about October 19, 2009, Barnes, LANGLEY and MELTZER caused Houston Refining to wire $1,127,759, which was calculated using a multiplier of 1.65 when the published ASBA market rate was .79, to a Fossil Energy account at UBS in Switzerland.

y.     In or about October 2009, after Houston Refining began questioning Barnes about the pricing for shipment of crude oil, Barnes, LANGLEY and MELTZER agreed to an "Updated COA Proposal" that allowed for prices to be based on "the ASBA weekly assessment on the bill of lading date."

z.      On or about March 9, 2010, LANGLEY sent an email rejecting Houston

Refining's invitation for him to visit Houston to resolve outstanding invoices between

Fossil Energy and Houston Refining.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH FIVE
### (Wire Fraud–18 U.S.C. § 1343)

A.      INTRODUCTION

1. The Grand Jury adopts, realleges, and incorporates herein Paragraphs One

through Five of Count One as if set out fully herein.

B.      THE SCHEME TO DEFRAUD

2.      From in or about October 2006 and continuing until in or about March

2010, in the Houston Division of the Southern District of Texas and elsewhere, the

defendants,

### BERNARD LANGLEY and

### CLYDE MELTZER,

aiding and abetting each other and Jonathan Barnes, knowingly devised and intended

to devise a scheme and artifice to defraud and to obtain money by means of material

false pretenses, representations, and promises, in that they paid millions of dollars in

kickbacks to Barnes so that his incentive would be to have Houston Refining pay

their companies higher rates for the shipment of crude oil than Barnes could actually obtain in the open market.

## C.   MANNER AND MEANS OF THE SCHEME TO DEFRAUD

3. The Grand Jury adopts, realleges, and incorporates, herein the manner and means allegations in Paragraphs Seven through Sixteen of Count One as if set out fully herein.

## D.   EXECUTION OF THE SCHEME TO DEFRAUD

4. On or about the dates set forth below, in the Houston Division of the Southern District of Texas, the defendants, for the purpose of executing the aforementioned scheme and artifice to defraud and to obtain money and property from others by material false and fraudulent representations, pretenses, and promises, did knowingly cause to be submitted by means of wire communication in interstate and foreign commerce the following:

| Count | Date | Interstate/Foreign Wire |
|-------|------|--------------------------|
| 2 | 5/3/2007 | $1,128,152 wire from Houston Refining account at JP Morgan to Fossil Energy account at UBS in Switzerland |
| 3 | 5/3/2007 | $733,213 wire from Fossil Energy account at UBS in Switzerland to American Title in Houston to purchase home for Barnes |
| 4 | 10/2/2007 | $991,257 wire from Houston Refining account at JP Morgan to Camac Belize account at UBS in Switzerland |

| 5 | 10/14/2009 | $1,333,071 wire from Houston Refining account at JP Morgan to Fossil Energy account at UBS in Switzerland |
|---|---|---|

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX
### (Conspiracy to Commit International Laundering-18 U.S.C. § 1956(h))

A.    INTRODUCTION

1.    The Grand Jury realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs One through Five of Count One.

2.    Company B is an oil trading company located in the New York area and controlled by a longtime associate of MELTZER'S.

B.    THE CONSPIRACY AND ITS OBJECT

3.    From in or about October 2006 and continuing until in or about November 2010, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

### BERNARD LANGLEY and

### CLYDE MELTZER,

did knowingly and intentionally conspire, combine, confederate, and agree with each other, with Jonathan Barnes, and with others known and unknown to the Grand Jury, to transport, transmit, or transfer funds from a place in the United States to or through

a place outside the United States, or to a place in the United States from or through a place outside the United States, knowing that the funds involved in the transmission or transfer represent the proceeds of some form of unlawful activity, and knowing that such transmission or transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity, that is, wire fraud (18 U.S.C. § 1343) and commercial bribery (Section 32.43 of the Texas Penal Code), in violation of Title 18, United States Code, Section 1956(a)(2)(A).

C.     MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that:

4.     The Grand Jury realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs Seven through Sixteen of Count One.

5.     When transferring the kickbacks into Barnes's bank accounts held in the United States, LANGLEY and MELTZER would and did typically funnel the kickbacks through a Swiss bank account in the name of Dulson Investments so Barnes's bank records would not show funds coming from the Camac Belize and Fossil Energy accounts to which Houston Refining was sending the inflated payments.

6.    On other occasions, LANGLEY and MELTZER would and did also pay kickbacks to Barnes and proceeds to themselves by wiring money from the UBS accounts in Switzerland directly to title companies, car dealerships, jewelry stores and other entities in the United States from which Barnes, LANGLEY and MELTZER were making purchases.

7.    LANGLEY and MELTZER would and did wire millions of dollars in MELTZER's proceeds from the UBS accounts in Switzerland to bank accounts controlled by other individuals in the United States who then used the funds to pay expenses for MELTZER. This included LANGLEY and MELTZER wiring millions from the Swiss accounts to bank accounts Company B held at HSBC in the United States. MELTZER would and did then cause the individual associated with Company B to use the millions received from the Swiss bank accounts to pay MELTZER's American Express bills and to make payments to MELTZER's friends and family.

8.    LANGLEY and MELTZER would and did use domestic bank accounts in the name of a Houston-based oil company with which they were associated to receive fraud proceeds from various accounts at the foreign banks where Camac and Fossil Energy were receiving the inflated payments so the funds could be classified as salary from the Houston-based oil company.

9.    LANGLEY and MELTZER would and did transfer fraud proceeds from the Fossil Energy bank account at UBS in Switzerland to the domestic Chase bank

account of a Houston sports bar in which Barnes, LANGLEY and MELTZER were

investors but would and did list a member of MELTZER's family as the investor in

the investment contract.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS SEVEN THROUGH TEN
### (International Money Laundering–18 U.S.C. § 1956(a)(2)(B)(i))

1.    The Grand Jury realleges and incorporates by reference, as though fully

set forth herein, the allegations contained in Paragraphs One, Two and Four through

Nine of Count Six.

2.    On or about the dates set forth below in the Southern District of Texas

and elsewhere, the defendants,

### BERNARD LANGLEY, and

### CLYDE MELTZER,

aided and abetted by each other, Jonathan Barnes and others known and unknown to

the grand jury, did transmit and transfer the funds described below from a place

outside the United States to a place in the United States, knowing that the funds

involved in the transmission or transfer represented the proceeds of some form of

unlawful activity, and knowing that such transmission or transfer was designed in

whole or in part to conceal and disguise the nature, location, source, ownership or

control of the proceeds of specified unlawful activity, that is wire fraud (18 U.S.C.

§ 1343)  and commercial bribery (Section 32.43 of the Texas Penal Code).

| COUNT | DATE | DESCRIPTION OF TRANSFER |
|-------|------|-------------------------|
| Seven | 12/17/2008 | $149,980 wire from Fossil Energy account at UBS in Switzerland to account in the name of Company B at HSBC in the United States |
| Eight | 5/04/09 | $140,000 wire from Fossil Energy account at UBS in Switzerland to account in the name of Company B at HSBC in the United States |
| Nine | 6/11/2009 | $1,000,000 wire transfer from Dulson Investment account at UBS in Switzerland to a Barnes personal account at Wachovia |
| Ten | 6/24/2009 | $2,800,000 wire transfer from Dulson Investment account at UBS in Switzerland to a Barnes personal account at Wachovia |

In violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.

## NOTICE OF FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to defendants,

### BERNARD LANGLEY and

### CLYDE MELTZER,

that in the event of their conviction of any of the offenses charged in Counts One through Five, all property, real or personal, which constitutes or is derived from proceeds traceable to such offense, is subject to forfeiture.

## NOTICE OF FORFEITURE
### 18 U.S.C. § 982(a)(1)

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to defendants,

### BERNARD LANGLEY and

### CLYDE MELTZER,

that upon conviction of any of the counts Six through Ten, all property, real or personal, involved in money laundering offenses or traceable to such property, is subject to forfeiture.

## Money Judgment

Defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, for which the defendants and their co-conspirators may be jointly and severally liable, and which is at least $80 million.

## Property Subject to Forfeiture

Defendants are notified that the property subject to forfeiture includes, but is not limited to, the following personal property, which includes funds on deposit in various bank accounts:

| Asset No. | Asset Type or Bank | Description (including VIN or account number) |
|---|---|---|
| 1 | 2008 Mercedes | VIN No. WDBSK72F68F139506 |
| 2 | 2008 Mercedes | VIN No. WDDGF56X48R019081 |
| 3 | 2009 Mercedes | VIN No. 4JGBF86E99A469213 |
| 4 | 2009 Mercedes | VIN No. WDDGF56X19R050323 |
| 5 | 2008 Mercedes | VIN No. WDDAK76FX8M001542 |
| 6 | 2009 Mercedes | VIN No. WDDNG71X39A275395 |
| 7 | 2009 Mercedes | VIN No. 4JGBF86E59A499745 |
| 8 | 2009 Mercedes | VIN No. WDBSK71FX9F154559 |
| 9 | 2009 Mercedes | VIN No. WDBSK70EX9F158323 |
| 10 | 2009 Bentley | VIN No. SCBDR33W69C059707 |
| 11 | 1957 Cadillac Brougham once owned by Frank Sinatra | VIN No. 5770145919 |
| 12 | 2010 Mercedes | VIN No. WDBSK7AA0BF161160 |
| 13 | 2010 Mercedes | VIN No. WDDRJ7HA0BA001114 |
| 14 | 2011 Buick Enclave | VIN No. 5GAKRCED1BJ161225 |
| 15 | Cobalt Boat | ID No. FGE30011J910 |
| 16 | Boat Trailer | ID No. 45JC1F336A1001010 |
| 17 | Sea Doo Jet Ski | ID No. YDV15561D010 |

| Asset No. | Asset Type or Bank | Description (including VIN or account number) |
|---|---|---|
| 18 | Sea Doo Jet Ski | ID No. YDV10508A010 |
| 19 | $1,132,542.63 | Funds seized from Wells Fargo account x2191 on or about August 10, 2010 |
| 20 | $5,000.29 | Funds seized from Wells Fargo account x2201 on or about August 10, 2010 |
| 21 | $1,140,611.10 | Funds seized from Wells Fargo account x2188 on or about August 10, 2010 |
| 22 | $55,030.41 | Funds seized from Wells Fargo account x1395 on or about August 10, 2010 |
| 23 | $6,135,059.13 | Funds seized from Chase account x9328 on or about November 23, 2010 |
| 24 | $163,384.80 | Funds seized from Chase account x6618 on or about November 23, 2010 |
| 25 | Diamond Earrings | Believed to be purchased from DeBeers by or on behalf of Barnes |
| 26 | Diamond Earrings | Believed to be purchased from DeBeers by or on behalf of Barnes |
| 27 | Bracelet and necklace | Purchased by or on behalf of Barnes but place of purchase unknown at this time |
| 28 | Silver solitaire ring with round diamond | Believed to be purchased from DeBeers by or on behalf of Barnes |
| 29 | Silver diamond pendant necklace | Believed to be purchased from DeBeers by or on behalf of Barnes |
| 30 | Square cut yellow diamond "Canary" ring | Believed to be purchased from DeBeers by or on behalf of Barnes |
| 31 | Gold "Cartier Roadster" watch | Purchased by or on behalf of Barnes but place of purchase unknown at this time |
| 32 | Silver bracelet with colored stones | Believed to be purchased from Valobra by or on behalf of Barnes |
| 33 | Gold colored bracelet with square design | Purchased by or on behalf of Barnes but place of purchase unknown at this time |
| 34 | Silver & diamond "Pa Ha Cartier" watch | Believed to be purchased from Zadok Jewelers by or on behalf of Barnes |
| 35 | Twisted silver jewelry | Believed to be purchased from Valobra by or on behalf of Barnes |

| Asset No. | Asset Type or Bank | Description (including VIN or account number) |
|---|---|---|
| 36 | Silver diamond and ruby necklace, bracelet & earrings set | Believed to be purchased from Zadok Jewelers by or on behalf of Barnes |
| 37 | Silver diamond bracelet | Purchased by or on behalf of Barnes but place of purchase unknown at this time |
| 38 | Silver Rolex watch | Purchased by or on behalf of Barnes but place of purchase unknown at this time |
| 39 | Currencies | Various currencies seized from Barnes at the airport on or about November 12, 2010 |
| 40 | BNP Paribas (France) | Account believed to be held in the name of Camac International with an account number ending in 2745 |
| 41 | BNP Paribas (France) | Account believed to be held in the name of Camac International with an account number ending 5W31 |
| 48 | UBS AG | Account believed to be held in the name of Fossil Energy with an account number ending in 7160V |
| 49 | UBS AG | Account believed to be held in the name of Camac International with an account number ending in 9860N |
| 51 | UBS AG | Account with an account number ending in 1360 or 360J, name of holder unknown at this time |
| 52 | UBS AG | Account believed to be held in the name of Farid Business, Inc., with an account number ending in 7360G |
| 53 | UBS AG | Account believed to be held in the name of Dulson Investment, with an account number ending in 5660B |
| 54 | UBS AG | Account believed to be held in the name of Jonathan Barnes, account number unknown at this time |
| 55 | 2009 Cadillac Escalade | VIN 1GYFC26219R256365 |
| 56 | 2009 Cadillac Escalade | VIN 1GYFC26229R265463 |

| Asset No. | Asset Type or Bank | Description (including VIN or account number) |
|---|---|---|
| 57 | 2009 Cadillac Escalade | VIN 1GYFC26239R154341 |
| 58 | 1991 Chevrolet Camaro | VIN 1G1FP23F5ML143847 |
| 59 | 1961 Chevrolet Impala | VIN 11867J223085 |
| 60 | 1960 Chevrolet Corvette | VIN 00867S107120 |
| 61 | Investment | Proceeds invested in the business operating as 360 Sports Lounge at 4601 Washington Ave, Suite 150, Houston, Texas, and any property traceable thereto |
| 62 | Jewelry | Jewelry bought with proceeds by or on behalf of Defendant Meltzer at Zadoks's in 2007 in the purchase amount of at least $468,617 |
| 63 | Jewelry | Jewelry bought with proceeds by or on behalf of Defendant Meltzer at Zadoks's in 2008 in the purchase amount of at least $396,782 |
| 64 | Jewelry | Jewelry bought with proceeds by or on behalf of Defendant Meltzer at Zadoks's in 2009 in the purchase amount of at least $570,047 |
| 65 | Jewelry | Jewelry bought with proceeds by or on behalf of Defendant Langley at Zadoks's in 2007 in the purchase amount of at least $18,569 |
| 66 | Jewelry | Jewelry bought with proceeds by or on behalf of Defendant Langley at Zadoks's in 2008 in the purchase amount of at least $224,991 |
| 67 | Jewelry | Jewelry bought with proceeds by or on behalf of Defendant Langley at Zadoks's in 2009 in the purchase amount of at least $164,286 |
| 68 | Money | Funds that may be held by Tuscan Petroleum or on its behalf (including in accounts at BNP Paribas or Societe Generale), believed to have been transferred from Defendants' proceeds accounts on or about 12/08/07 and 3/12/08 and 3/12/09 and characterized as "loan to Tuscan" in the amount of at least $3.3 million from Barnes and $2 million from Defendant Langley |

| Asset No. | Asset Type or Bank | Description (including VIN or account number) |
|---|---|---|
| 69 | BSI AG (Switzerland) | Account with an account number ending in 4036 |
| 70 | CFM Monaco | Account believed to be held in the name of Bernard Langley, account number unknown at this time |
| 71 | LGT Bank (Liechtenstein or Switzerland) | Accounts held in the name of Bernard Langley and Clyde Meltzer, account numbers unknown at this time |

Defendants are further notified that the property subject to forfeiture includes, but is not limited to, the following real property, together with all improvements, buildings, structures and appurtenances:

(1)     (deliberately omitted)

(2)     (deliberately omitted)

(3)     real property in Bellaire, Texas, which is legally described as follows:

> That tract or parcel containing 0.4528 acre of land out of Lot 24, Block 1 of Westmoreland Farms Amended First Subdivision, a subdivision of record in Volume 3, Page 60 of the Harris County Map Records, Harris County, Texas, being that same tract of record under Harris County Clerk's File Number (H.C.C.F. No.) S339234.

The record owners are Jonathan Barnes and wife.

(4)     real property in Houston, Texas, which is legally described as follows:

> Lot One (1) in Block One (1) of Wynden Oaks Estates, an addition in Harris County, Texas, according to the map or plat thereof recorded in Film Code No. 365126 of the Map Records of Harris County, Texas.

Purchased with proceeds by Barnes.

(5)    real property at 8376 Del Prado Drive, Delray Beach, Florida, which is legally

described as follows:

> Lot 24, Delray Training Center PUD, Parcel H, according to the Plat thereof, as recorded in Plat Book 92, Page 78, Public Records of Palm Beach County, Florida.

Purchased with proceeds by Defendant Meltzer.

(6)    real property at 4911 Welford Drive, Bellaire, Texas, which is legally

described as follows:

> Lots 17 & 18, Teas Garden, Section 2, a subdivision in Harris County, Texas, according to the map or plat thereof recorded in volume 29, page 35 of the map records of Harris County, Texas.

Purchased with proceeds by Defendant Meltzer.

(7)    real property at 11 Regent Drive, Keston, in the county of Kent in England,

where Bernard Langley has lived with his wife.

Purchased with proceeds by Defendant Meltzer.

## **Substitute Assets**

Defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of defendants,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided

without difficulty,

the United States will seek to forfeit any other property of the defendants up to the

total value of the property subject to forfeiture pursuant to Title 21, United States

Code, Section 853(p), as incorporated by reference in Title 28, United States Code,

Section 2461(c) and Title 18, United States Code, Section 982(b)(1).


A TRUE BILL:

ORIGINAL SIGNATURE ON FILE

FOREPERSON OF THE GRAND JURY


JOSE ANGEL MORENO
United States Attorney

By: _____

Gregg Costa
Assistant United States Attorney